MADDOX, Justice
(dissenting).
The majority quashes the writ. Therefore, the judgments of the Court of Criminal Appeals in Betty Woods Wilson’s appeal from her judgment of conviction (CR-92-1223) and in her post-conviction Rule 32, Ala. R.Crim. App., petition (CR-93-2132) are affirmed. After reviewing the record and considering the briefs and the oral arguments of the parties, I agree with the majority that the writ is due to be quashed in the case involving Wilson’s judgment of conviction; however, I believe that the judgment denying her Rule 32 petition should not be affirmed or reversed, but that the cause should be remanded to the trial court, with directions for further consideration. In this dissent I will list the principles of law that I believe are controlling and why I reach the conclusion that I do regarding her post-conviction claims.
Betty Woods Wilson was convicted of capital murder for hiring James Dennison White to kill her husband, Dr. Jack W. Wilson. The murder was made capital because it was allegedly “done for pecuniary or other valuable consideration or pursuant to a contract for hire.” § 13A-5-40(a)(7), Ala.Code 1975. Wilson waived the jury’s participation in the sentencing phase of her capital trial and, upon a recommendation of the State, Wilson was sentenced to life in prison without the possibility of parole. Wilson appealed the conviction to the Court of Criminal Appeals, but while that appeal was pending, she filed a petition for post-conviction relief pursuant to Rule 32, collaterally attacking her conviction and sentence, as Rule 32 permits. Barnes v. State, 621 So.2d 329, 332-33 (Ala.Crim.App.1992).
In her petition she requested a new trial because; (1) the prosecution had failed to disclose evidence favorable to her;[1] and (2) James White, who had pleaded guilty as the actual killer and who was the State’s key witness during her trial, had recanted the testimony he gave at her trial. The trial court denied Wilson’s Rule 32 petition, and entered a written order. Wilson appealed to the Court of Criminal Appeals. That Court consolidated Wilson’s Rule 32 appeal with her direct appeal, and affirmed both judgments. Wilson v. State, 690 So.2d 449 (Ala.Crim.App.1995) (Patterson, J., dissenting). After the Court of Criminal Appeals denied her application for rehearing,[2] she petitioned this Court for certiorari review of both the judgment affirming her conviction and the judgment denying her Rule 32 petition, and this Court granted her petition.
*479 In her petition to this Court, Wilson raises the same nine issues she raised in her appeals to the Court of Criminal Appeals; these nine issues consist of six relating to errors she said occurred in her criminal trial and three she says occurred in the trial court’s consideration and hearing on her Rule 32 petition.
The facts surrounding this homicide are sufficiently set out in the majority and dissenting opinions of the Court of Criminal Appeals; consequently, I state here only those facts that persuade me that Wilson has shown that she is entitled at least to have the trial court further consider her Rule 32 petition.
Dr. Jack Wilson, the defendant’s husband, was found dead at his home in Huntsville on May 22,1992. He had been stabbed twice in the chest and had been severely beaten around the head and torso. Ms. Wilson and her twin sister, Peggy Lowe, and James White were subsequently indicted for capital murder. The theory of the State’s case was that Ms. Wilson and her twin sister, Peggy Lowe, had hired James White to kill Dr. Wilson so that Ms. Wilson would be free of him and would be the beneficiary of his sizable estate. The prosecutor elected to try Wilson and Lowe separately, with Wilson’s case proceeding first. The prosecutor elected not to tiy White until he had testified in the trials of the two sisters.
White testified at Wilson’s trial that he had been hired to kill Dr. Wilson for $5,000, and he implicated both Wilson and her sister, Lowe. Wilson was convicted and sentenced to life without parole. Her sister was subsequently tried and acquitted. White pleaded guilty and was sentenced to life imprisonment, with the possibility of parole.
I.
I first address Wilson’s claims that the prosecution failed to turn over evidence in her trial, in violation of the principles articulated in Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and Kyles v. Whitley, 514 U.S. 419, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995), a case decided after both the trial court and the Court of Criminal Appeals had considered Wilson’s Rule 32 petition. In addressing this question, I will point out that Wilson made a pre-trial request for discovery of all records generated or maintained by the Alabama Department of Mental Health and Mental Retardation pertaining to James White, the alleged co-defendant, but that some of the requested records were not made available to Wilson before her trial.
On July 17, 1992, Wilson filed a motion styled “Motion for Discovery of Prosecution Files, Records, and Information Necessary to a Fair Trial,” and she subsequently, on July 30, 1992, filed a motion styled “Motion for Discovery of Institutional Records and Files Necessary to a Fair Trial.” That July 30 motion read, in part, as follows:
“COMES NOW Defendant, by and through her undersigned attorneys, and respectfully moves this Honorable Court, pursuant to Rule 16 of the Alabama Rules of Criminal Procedure; applicable State law; the Sixth, Eighth and Fourteenth Amendments to the United States Constitution and the corresponding provisions of the Alabama State Constitution, to order the production of the materials specified below. Defendant additionally relies on Ex parte Monk, 557 So.2d 832 (Ala.1989), in which the Alabama Supreme Court held that capital cases are ‘sufficiently different to justify broadened discovery.’
“Defendant requests that this Court order the individuals named below to produce for inspection and copying the documents specified herein, wherever such documents may be located, with such production to be arranged within thirty (30) days after discovery is ordered.”
In this motion Wilson asked for several documents, but the documents that are the specific subject of Wilson’s Rule 32 petition were described in the motion as follows:
“6. All records generated or maintained by the Alabama Department of Mental Health and Mental Retardation and pertaining to the Defendant, codefend-ant or accomplice;
“7. All records pertaining to Defendant, codefendant or accomplice and gen *480 erated by the Taylor Hardin Secure Medical Facility, Tuscaloosa, Alabama;
[[Image here]]
“10. Any and all medical, psychological, psychiatric or mental examinations or evaluations relating to the Defendant, James Dennison White, a/k/a James Dennison Howell, that [have been] or will be performed by any State or governmental agency.”
It is undisputed that Wilson, on August 11, 1992, filed a motion styled “MOTION TO EXPEDITE MOTIONS FILED AND REQUEST TO ALLOW DEFENDANT TO .HAVE A DICTAPHONE IN HER JAIL CELL,” in which she specifically asked, in part:
“that the Court expedite its decisions on the following motions: ... Motion for Discovery of Institutional Records .and Files Necessary to a Fair Trial.”
She alleged, in part:
“4. For each day the Defendant is denied her constitutional right to participate and prepare her defense, she is losing a day of valuable time to prepare her trial and participate in her own defense.”
On February 1, 1993, Wilson filed another motion styled “MOTION TO EXPEDITE MOTIONS FILED,” in which she stated, in part:
“COMES NOW the Defendant, Betty Woods Wilson, by and through her attorney of record, and moves this Court to expedite its decisions on the following motions: ... 13. Motion for Discovery of Institutional Records and Files Necessary to A Fair Trial filed July 30, 1992 ...”
Based on the foregoing, it appears to me that Wilson filed sufficient requests to get the institutional records regarding White.
The facts surrounding the legal issue presented in this case are not seriously disputed. In fact, many of the facts were included in a stipulation that is a part of the record. The facts show that after James White was indicted, his defense attorney made a pre-trial motion to have him examined to determine his competency to stand trial on the capital murder charge. Because White was found to be indigent, the trial judge ordered that a psychiatric evaluation be performed on him at the State’s expense. In August 1992, Dr. Lawrence Maier, who was under contract with the Department of Mental Health and Mental Retardation, examined White at the Taylor Hardin Secure Medical Facility (“Taylor Hardin”). Of some significance in this case is the fact that Dr. Maier’s evaluation report was made of White after White had given seven statements to State agents, in which he had stated to the police many of the facts surrounding the homicide, but had not stated the time of the homicide.
During his examination of White, Dr. Mai-er made handwritten notes of information he obtained in the interview, including facts relating to the capital murder charges then pending against White, Wilson, and Lowe. Immediately following the interview, Dr. Maier prepared an initial competency evaluation report, and the supplemental notes that he later filed are the subject of this proceeding.
Why does Wilson claim that the notes were material? At her trial, her counsel questioned White about inconsistencies between his trial testimony and statements he had previously given to the police, including statements relating to the time the murder occurred. Regarding the .time of the homicide, White testified that he could not recall any exact times, including the time of the murder, because, he said, he did not carry a watch and he was suffering from blackouts. According to Dr. Maier’s notes, however, White told him that he committed the murder between 6:00 and 6:30 p.m.
After examining White, Dr. Maier determined that White was mentally competent to stand trial, and he filed his report at Taylor Hardin and furnished copies to the prosecution, to White’s attorney, and to the trial court, but Dr. Maier did not file the handwritten notes or a transcription of them at that time; rather he took the notes with him and later had them transcribed, after which he sent a copy of them to Taylor Hardin, where, as was required, the notes were attached to the initial evaluation report that he had previously prepared. It was the State’s failure to produce these notes, in which Dr. Maier stated that White had told him that *481 the murder occurred between 6:00 and 6:30 p.m., that forms the basis of Wilson’s claim that her constitutional rights were violated and that she is, therefore, entitled to a new trial.
For a better understanding of Wilson’s constitutional claim, I state some of the basic facts relating to the notes, their content, and their relevance insofar as Wilson’s trial is concerned.
After White was examined by Dr. Maier, the trial court held a hearing to determine White’s competency to stand trial. The trial judge determined that White was mentally competent to stand trial, as Dr. Maier had concluded in his evaluation; however, before White’s trial, and before Wilson’s trial, White entered into a four-page contingent plea agreement with the prosecutor, wherein White agreed to provide “truthful and complete corroborating evidence ... substantiating the complicity and involvement” of Wilson and her twin sister, Lowe, in the murder of Dr. Wilson. The prosecution, in turn, agreed to recommend, after Wilson and' Lowe were tried, that White be allowed to plead guilty to the offense of murder (a lesser included offense of capital murder) and be sentenced to life imprisonment. Stated differently, the substance of the agreement was that if White would testify against Wilson and Lowe, he would not face execution, or, for that matter, a sentence to life imprisonment without parole, for his part in the murder of Dr. White, but would instead receive only a life sentence with the possibility of parole.
The basic facts surrounding the preparation and filing of the handwritten notes are not disputed. In fact, at the Rule 32 proceeding, the parties entered into the following stipulation of facts regarding the notes taken by Dr. Maier:
“1. Dr. Lawrence R. Maier was appointed to do a mental competency evaluation of James Dennison White. Dr. Maier is regularly employed on a contract basis by the Alabama Department of Mental Health and Mental Retardation to evaluate all criminal defendants where there is a question as to their mental competency. Dr. Maier is employed to work in the Huntsville, Alabama, area. Maier’s evaluation of White was the result of action taken by White’s attorney, Roy Miller. The request by Miller for the evaluation was made in the case of State of Alabama v. James Dennison White, CC-92-1193-FJ. The evaluation was ordered by Judge Jeri Blankenship on July 14, 1992.
“2. On August 5,1992, Dr. Maier interviewed James Dennison White. Thereafter, Dr. Maier filed a formal report with the District Attorney of Madison County, Alabama, with Judge Blankenship, and with Roy Miller.
“3. Prior to the trial of Betty Woods Wilson for capital murder, the report prepared by Dr. Maier was supplied to [one of] Betty Woods Wilson’s lawyers, namely, Marc Sandlin, by Assistant District Attorney Susan T. Moquin, pursuant to an order by Judge Thomas Younger.
“4. It is the practice of Dr. Maier to cause his notes to be transcribed and typed. Dr. Maier’s notes, taken during the interview of James Dennison White, were typed up into a three page document entitled Additional Information Section.’ These transcribed notes were sent by Dr. Maier to Taylor Hardin Secure Medical Facility as required of him by of the Department of Mental Health and Mental Retardation. However, the notes were not supplied to the District Attorney of Madison County, Alabama, to the Assistant District Attorney involved, to Judge Blankenship, to Roy Miller, or to [the] prosecutor, James Fry. The notes ... were not supplied to Betty Wilson’s lawyers prior to her trial.”
The parties also stipulated that neither Wilson nor her attorneys knew of the existence of the notes until they were handed over to them by Lowe’s attorneys on a date after Wilson was tried.[3] In addition, the parties orally stipulated that no member of the prosecution nor any member of the police *482 force had had any knowledge of the existence of the transcribed notes.
In White’s own case, a different trial judge than the one who tried Wilson’s case had directed that White be evaluated by a psychiatrist at the State’s expense, and had ordered that White “undergo examination by a 'Certified Forensic Examiner appointed by the Alabama Department of Mental Health and Mental Retardation,” to “be conducted on an outpatient basis by Taylor Hardin Secure Medical Facility or regional outpatient program under contract to the Alabama Department of Mental Health and Mental Retardation.” This order was entered on July 14, 1992, in James White’s case by Circuit Judge Jeri Blankenship. This order was entered three weeks before Wilson’s discovery motion was filed.
On September 2, 1992, the trial judge in Wilson’s case entered an order, which I attach as Appendix A, in which he ordered the prosecution to turn over certain items of evidence, stating that the prosecution was required to turn over the requested evidence pursuant to the discovery provisions of Rule 16, Ala. R.Crim. P. It is not absolutely clear from the record, however, whether this September 2,1992, order was entered as a result of the “Motion for Discovery of Prosecution Files, Records and Information Necessary to a Fair Trial” filed July 17, 1992, or was entered as a result of the “Motion for Discovery of Institutional Records and Files Necessary to a Fair Trial” that Wilson had filed on July 30, 1992. In any event, it is clear that the latter motion was specific enough to include not only the evaluation report that Dr. Maier had done, but his notes as well, which it appears were a part of White’s file at the time the motion was filed. (See, Paragraphs 6, 7, and 10 of the “Motion for Discovery of Institutional Records and Files Necessary to a Fair Trial,” quoted above, 690 So.2d at 479-80.)
In his September 2, 1992, order, the trial judge directed the prosecution to turn over documents that were “known to exist or which with due diligence could be determined to exist, and to allow the attorneys [for Wilson] to inspect, test, examine, photograph or copy the same.”
Even though the trial judge entered the order on September 2,1992, and even though Wilson had asked in her motion seeking the institutional files that “such production ... be arranged within thirty (30) days after discovery is ordered,” the record shows that the prosecution did not turn over to Wilson’s attorneys the evaluation report by Dr. Maier until February 5, 1993, which was 5 months after the order was entered and only 16 days before the commencement of the trial, and only after Wilson’s attorneys had on February 1, 1993, filed a “Motion to Expedite Motions Filed.” A copy of that Motion is attached as Appendix B.
I cannot tell from the record before this Court the exact date when the prosecution turned over the requested documents; nor can I determine whether the evaluation report that was given to defense counsel was the one sent to the prosecution in White’s case, or whether the prosecution obtained the evaluation report from Taylor Hardin to comply with Wilson’s request for the institutional files generated or maintained by Taylor Hardin. In any event, the parties stipulated that Dr. Maier’s notes were not produced to Wilson before her trial and that she found out about the notes when attorneys for Peggy Lowe, in Peggy Lowe’s case, were given a copy of the notes.
Although I do not know the specific purpose Wilson had in mind for requesting the documents pertaining to Dr. Maier’s evaluation of White, one can assume that Wilson wanted to get as much background information as possible on White’s past behavior and possible mental problems so that she could discredit him and any testimony he might give.[4]
*483 Relevant to the instant inquiry, of course, is the fact that Dr. Maier’s notes included a statement made by White in which White admitted that he had committed the murder sometime between 6:00 and 6:30 p.m. In none of the seven statements that White gave to police before he was evaluated by Dr. Maier did he state that the murder had occurred between 6:00 and 6:30 p.m. In fact, as I have stated earlier, White testified at Wilson’s trial that he could not recall any exact times, including the time of the murder, because, he said, he did not carry a watch and he was suffering from blackouts.
According to Wilson, the time of the actual commission of the crime was significant to her defense because she presented evidence of her whereabouts between 5:25 p.m. and 8:00 p.m. It appears that an important component of the prosecution’s case was the establishment of a time line that would prove that the defendant Betty Wilson had the opportunity to participate in the murder of her husband. The prosecution presented evidence to establish this time line: (1) through the testimony of several witnesses who stated that they saw Wilson on the day of the murder; and (2) by the introduction of business records that showed where and when Wilson had made purchases that day. In his seven statements to the police before he was evaluated by Dr. Maier, and at trial, White stated that he could not recall any exact times, including the time of the murder, because, he said, he did not carry a watch and he was suffering from blackouts. A review of the record shows that specific times that appeared to be important to the prosecution included the time that Wilson allegedly picked up White at a shopping mall, the time of day the murder was committed, and the time that Wilson allegedly picked up White at her home.
The State contended at Wilson’s trial that the time-line evidence corroborated White’s trial testimony and gave Wilson the opportunity to participate in the murder. In any event, the evidence of Wilson’s whereabouts on the day of the murder was a substantial part of the State’s case and of Wilson’s defense. The prosecution’s theory of the case was that Wilson had the opportunity to take White to her home between 2:15 p.m. and 3 p.m., and that Wilson could have picked up White only between 4:50 and 5:25 p.m., because business records tended to confirm that she made her last purchase at 4:49 p.m. and witnesses accounted for her whereabouts .after 5:25 p.m. the day of the murder. Wilson claims that she was at the mall most of the afternoon of the day of the murder, leaving briefly to go to a tanning booth and returning thereafter.
The prosecution’s theory of the time line and its importance is shown by the closing arguments made by the prosecution to the trial jury, where the prosecutor stated:
“Well, that moves us up to the next day. Moves us up to the 22nd of May. How do we know where the defendant was and how do we know where James was? Well, I put myself something together called ‘Where is Betty? Where is James?’ And you all, do the same thing with all the notes I saw you taking. Because we know from the cash register receipt that she was at Yielding’s that day and bought some shoes, which you all saw ... but bought a pair of shoes like some flowery Keds, which we had here but did not go into evidence. She bought those shoes there. Same shoes, by the way, that later on [N.N.] and I believe some other people said she had on, that they saw her with those Keds. Well, James White described those shoes for you. How did he know? Oh, well, he was stalking. That’s what you are going to hear, he was stalking. Why? Why? He didn’t even know the woman. Talked to her on the telephone. Unless he is telling the truth. He described those shoes for you.
“You know where she went next, the tanning salon, after dropping James off at about 2:30, between 2:10 and 2:30. And by the way you will have the map. You have got the scale. From Parkway City Mall, right here, up to their home on Boulder *484 Circle here. And Trey told you himself, he told you himself, less than five minutes, four or five minutes, just a short little hop, skip, and a jump. Could have been there by 2:15, 2:20, if she left after she made the purchase, and James was in the house.
“And then you know the rest of the places that she went that afternoon. We have documented that for you. We established everywhere we know she went, including, according to Micky Brantley, who said the defendant told him that she went to the bank that afternoon. In fact, her excuse, as I recall the testimony, was for taking — for going back home, where she forgot the bank bag.
“And what else did he tell you? Told you that when she came back, when he got in the back seat of the car, he covered himself with some plastic bags that seemed to have some clothes in them. And what color did he say the one that was in his face was? He said that it was pink. How did he know? How could he have known? How could he have guessed pink? How could he have guessed clothing bags? Because he was there, because it was in his face. You remember?
“You will remember Peggy Black told you that when the defendant came by the Morgan headquarters that night, that she had a bank bag with her, and she told her once or twice or several times that they would be back in the morning, they were going on a trip, that she would come back in the morning and give her the deposit slips. Wait a minute, wait a minute. She already made the deposit, she had made the deposit. What was this all about? Why did she tell her that? She had made the deposit. The deposit slip, apparently, was in the bag. What was this nonsense about coming back? Why didn’t she just give the thing to Peggy Black then? Could it have been that she was establishing being somewhere at 4:30 — or, rather, 5:80, 5:45?
“Part of the instructions of law which I think the judge is going to give you ... is about corroborating evidence and connecting the defendant with the crime. We have got to connect her, at least by implication, with the crime. And one of the ways you can do that is to establish the defendant’s closeness to the crime itself. Sheila Irby does that. You remember Sheila Irby? Sheila Irby was the lady who was taking her daughter to play softball, and she was making trips back and forth, and she had gone back and calculated the time it was that she had to be at the ballpark, the time she got there, the time she left the mall. You all heard the testimony. But it was her testimony that she saw James White on the street at, I believe, 5 ‘til 5:00, 10 ‘til, something like that, but right at 5 o’clock. She went home, got her girls, made a trip, came back, and by her testimony no later than 5:10, if I remember correctly, she saw the defendant on this case heading toward Boulder Circle. Not on Boulder Circle, on Chandler Street, but headed towards Boulder Circle where she lived. That’s exactly where James White tells you he was picked up. That’s exactly the neighborhood where the murder occurred. It puts her there with White ar at least within 10 minutes of it.”
On the other hand, defense counsel Jack Drake argued that White was not credible and that the murder could not have happened as claimed by the prosecution:
“Let’s look at some of the specific answers to what James White says. He says that he was over there on Boulder Circle between — well, actually these are specific answers to his whereabouts and what the State says about him and Betty. Andy Sieja, the little 13-year-old boy — remember him — came in here in this place and appeared not to even be scared. I thought he was going to be seared to death. He was out there in the circle from somewhere right after 3 o’clock, when he got home, on up to about 5:15. He was out there playing, he and two friends. They didn’t see Betty. They didn’t see Betty. They didn’t see Betty bring James White over there and pick him up. They didn’t see it because it didn’t happen.
“Mrs_[a witness], who doesn’t even live on the circle, lives somewhere else, says she saw Betty in the area in her car. She didn’t say it initially, she only *485 said it after things really got going in the newspapers. I think you can explain [that witness’s] conduct and her testimony in several ways. One, she is mistaken, the other is that maybe she is a dingbat. And y’all can make the choice.
“We know that David Williamson saw James White over in the Ramada Inn and had a confrontation with him, a violent confrontation, saw him at the bar at 5:15. James White says he was in the house for several hours. He wasn’t in the house, we know that now.
“Dr. Wilson came home about 4 o’clock, he went out and drove a stake in the front yard, these boys saw him. He was alive at 4:30. James White wasn’t in the house, it didn’t happen that way.
“And we have this note, the note that-everybody says Dr. Wilson wrote. Now, Jimmy Fry started out saying this 2 was a 3. It’s a 2, you can see it when we blow it up. I mean, there is no question about it. It’s 1715, 22 May. It appears that he wrote down the time and the date and had some things to do. Now, could this be a mistake, could he have done it on the wrong day or something? No. Critical little piece of information right there. ‘Mr. Hyde,’ and he marked it through. He called Mr. Hyde, that’s the message on the answering machine where he told him to bring that piece of equipment over to my office — I’m sorry, I never understood what this thing was, bring something to my office and get the key from the pharmacy so you can get into the office. Remember that?
“He was alive at 5:15, no surprise, -because James White was over at the Ramada Inn getting tanked up on alcohol and taking fast ones, getting ready to do something.”
Later, defense counsel Bobby Lee Cook argued:
“You heard James White for over a day. And there is one — we had the court reporter to transcribe everything that he said. There is one statement that he made that I have no problem disagreeing with. And the question was, ‘When did you start telling the truth?’ And he said, and I quote, Mr. Fry, T can’t remember exactly what day it was, what day it was that I started.’ In these two documents, which represent his testimony in this case, he has admitted to lying under oath 58 times.”
Unquestionably, White’s testimony that implicated Wilson was critical to the prosecution’s case. In fact, in the plea agreement with James White, the prosecution admits that the “capital murder charges against BETTY WOODS WILSON and PEGGY JOY WOODS LOWE would, of necessity, have to be dismissed in absence of this agreement and the testimony and cooperation of JAMES DENNISON WHITE.” Consequently, evidence that not only would corroborate Wilson’s evidence that she did not participate in the murder, but also would contradict some of White’s trial testimony (which is consistent -with White’s recantation testimony that Wilson was not guilty) would be relevant and material on the issue of Wilson’s guilt.
Evidence relating to the credibility of White was highly relevant because White was an accomplice, whose testimony, as a matter of law, had to be corroborated, and at least one Judge on the Court of Criminal Appeals was of the opinion that the State failed to meet its burden of corroborating White’s testimony, as required by law.[5] Although I do not agree that Wilson was entitled to a judgment of acquittal as stated by the dissenting Judge on the Court of Criminal Appeals, the record does show that, during a two month period following his initial arrest, White gave seven separate statements concerning his role in Dr. Wilson’s murder and in some of those statements changed his story in relation to many aspects of the crime; however, in his statement of the facts that he gave to Dr. Maier, at a time after he had given the seven statements, *486 White was very specific about the time when he left the Wilson house after the homicide.
There were many inconsistencies in White’s statements. For example, White said in his first five statements that he had met Wilson and Lowe at Logan Martin Dam on Tuesday, May 19. This was inconsistent with his trial testimony that he had met them at the dam on Wednesday, May 20. Additionally, White gave three different accounts of what happened after he committed the murder. Initially, he stated that he left the Wilson home by cutting through the woods behind the house to a roadway where he had left his truck; later, he claimed that he had waited inside the house until Wilson returned home to pick him up. At trial, however, he testified that he did not remember what he did immediately after killing Dr. Wilson, and that his first recollection after the murder was sitting in the woods, where he said he waited until Wilson returned home.
At her Rule 32 hearing, Wilson called White as a witness to give oral testimony, but White, who had executed a recantation affidavit, refused to testify, claiming his Fifth Amendment privilege against self-incrimination. The record shows that the State’s position regarding White’s invocation of the Fifth Amendment privilege was that White should be allowed to invoke his privilege not to incriminate himself. The trial judge, after initially stating to White when he invoked his Fifth Amendment privilege that “[y]ou have no right to invoke the Fifth Amendment in this matter and you are directed to testify,” nevertheless later agreed with the State’s position on the issue and refused to require White to testify. Consequently, Wilson was not permitted to ask White questions relating to his trial testimony that had implicated her or to question him about the statement he had made to Dr. Maier relating to the time that the murder occurred, and further delve into the inconsistencies between what he told the police and what he told Dr. Maier.
Based on the above-mentioned facts, Wilson claims she should be granted a new trial. She says it is clear that the prosecution failed to turn over exculpatory evidence in the State’s possession, in violation of Rule 16, Ala. R.Crim. P., and in violation of the principles of law set forth in Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and Kyles v. Whitley, 514 U.S. 419, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995).
I was almost persuaded to agree with Wilson’s argument that she had shown sufficiently her entitlement to a new trial, but there are a number of facts relating to her pre-trial “Motion for Discovery of Institutional Records and Files Necessary to a Fair Trial” that are not clear, and the trial judge’s ruling in his final order denying Wilson’s Rule 32 petition — that “[hjad [Dr. Maier’s] notes been requested they could have been produced by Dr. Maier either voluntarily or by court order” — needs clarifying. I do not fully understand the basis for that portion of the trial judge’s order denying Wilson’s Rule 32 petition, where the trial judge specifically stated the following about Dr. Maier’s notes:
“Finally, as to the issue concerning ‘additional notes,’ it is clear that the evidence is not newly discovered. By stipulation and the testimony of Petitioner’s attorney, Mr. Charles Hooper, it is clear that White’s evaluation report was important to the defense. They requested and received a copy of the evaluation containing references to the dates and times White was interviewed by Dr. Maier. They were on notice that Dr. Maier had interviewed White in compiling his evaluation and should have anticipated that he took notes during the interview. Witness Hooper testified that he spoke with Dr. Maier prior to trial. Had the notes been requested they could have been produced by Dr. Maier either voluntarily or by court order.”
(Emphasis added.) I do not understand why the trial judge found that Wilson did not request Dr. Maier’s notes. My review of the record suggests that Wilson filed a specific request before trial and requested production of institutional records that contained Dr. Maier’s notes. One of the reasons why I would remand the case is to give the trial judge an opportunity to clarify his finding and to answer these specific questions:
1. When were Dr. Maier’s notes (“Additional Information Section”) made a part of the “records generally maintained by the Alabama Department of Mental Health *487 and Mental Retardation and pertaining to [White]”?
2. To which motion did the September 2, 1992, order refer?
3. What specific records were produced for the defendant, Betty Wilson, as ordered by the trial court on September 2, 1992, and on what dates were those records produced? List the specific records produced.
4. What action, if any, did the trial court take in response to Wilson’s discovery request styled “Motion for Discovery of Institutional Records and Files Necessary to a Fair Trial,” and when was that action taken? If no action was taken, why was no action taken, in view of the motions to expedite?
5. What action did the trial court take in response to Wilson’s motion styled “Motion to Expedite Discovery Request”?
I regret that the majority will not at least agree to remand the post-conviction petition to the trial court, because I believe that the answers to these questions are necessary for an adequate evaluation of Wilson’s Brady and Kyles claim.
In addition to the above, I believe that the trial judge correctly stated initially that White was not permitted to invoke his Fifth Amendment privilege against self-incrimination, but then erroneously changed his ruling after argument by the State. When White invoked the Fifth Amendment privilege, he had given an affidavit that contradicted his trial testimony.[6] An affidavit is a statement signed under oath in the presence of a witness and sealed by a notary. Statements contained in an affidavit, if shown to be false, can subject the declarant to a criminal prosecution for perjury. See, Singleton v. State, 29 Ala.App. 303, 195 So. 459 (1940). In any event, “[a] witness who discloses a fact or transaction without invoking his privilege against self incrimination is deemed to waive that privilege with respect to that fact or transaction.” F.W.P. v. State Department of Human Resources, 606 So.2d 153, 155 (Ala.Civ.App.1992). As the United States Supreme Court stated in Hoffman v. United States, 341 U.S. 479, 71 S.Ct. 814, 95 L.Ed. 1118 (1951):
“To sustain the privilege [against self-incrimination], it need only be evident from the implications of the question, in the setting in which it was asked, that a responsive answer to the question or an explanation of why it cannot ■ be answered might be dangerous because injurious disclosure could result.”
341 U.S. at 486-87, 71 S.Ct. at 818. See, Ex parte Baugh, 530 So.2d 238 (Ala.1988).
In support of its conclusion that White had not waived his privilege, the Court of Criminal Appeals cited Pennington v. State, 420 So.2d 845 (Ala.Crim.App.1982), but I find that case to be distinguishable. In Pennington, the court stated that “[individuals who testify in either civil or criminal proceedings have the right to refuse to answer relevant questions where the answers might tend to incriminate them in future proceedings.” 420 So.2d at 849. (Emphasis added.) Pennington, therefore, stands for the proposition that a witness cannot be compelled to testify when the answers might be used to incriminate the witness, but that case does not address the question presented here — whether a waiver had already occurred, before the witness was called to testify.[7]
*488 In view of the fact that I stand alone in stating that I would remand the case before affirming the judgment, I set out some of the legal principles that draw me to that conclusion.
In Brady, the United States Supreme Court held “that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.” Brady, 373 U.S. 83, 87, 83 S.Ct. 1194, 1196-97, 10 L.Ed.2d 215 (1963). The Court reasoned that this rule was necessary to ensure the public’s interest in conducting fair criminal trials and guaranteeing efficient administration of justice:[8] Later, in United States v. Agurs, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976), the Court refined its holding in Brady, not only by giving a definition of “materiality” in relation to a Brady analysis,[9] *489 but also by making it clear that the. defendant’s failure to request favorable evidence did not leave the prosecution free of all obligation to disclose exculpatory evidence.[10] In United States v. Bagley, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985), however, the Court abandoned the rule that the standard for determining materiality is contingent on the type of Brady violation involved, holding that a single standard of materiality should be applied by a reviewing court, regardless of the type of request made by the defendant for exculpatory evidence. Bagley, 473 U.S. at 682, 105 S.Ct. at 3383-84. In my opinion, these three cases continue to be relevant to a Brady violation analysis.
Although these Brady issues mainly dealt with the proper standard for determining whether suppressed evidence is material, it is apparent from these cases that a Brady analysis involves more than determining whether the undisclosed evidence is material. A Brady violation occurs where: 1) the prosecution has suppressed or withheld evidence; 2) the evidence was favorable to the defendant; and 3) the evidence was material to the issues at trial. United States v. Perdomo, 929 F.2d 967 (3d Cir.1991); Stano v. Dugger, 901 F.2d 898 (11th Cir.1990); Ex parte Kennedy, 472 So.2d 1106 (Ala.1985); McMillian v. State, 616 So.2d 933 (Ala.Crim.App.1993). See also, Moore v. Illinois, 408 U.S. 786, 92 S.Ct. 2562, 33 L.Ed.2d 706 (1972). Therefore, in order for Wilson to prevail on her claim that her due process rights guaranteed by the United States Constitution were violated by the prosecution’s failure to turn over Dr. Maier’s notes, she must show that the three elements set out above are present.
First, Wilson must demonstrate that the prosecution suppressed or withheld Dr. Mai-er’s notes. Because the parties concede that the prosecution did not know of the existence of these notes until after Wilson’s trial, the question whether Wilson showed that the prosecution “suppressed” this evidence requires close analysis. While a prosecutor’s lack of knowledge is important to the inquiry, it has been said that a prosecutor’s lack of knowledge of exculpatory evidence does not necessarily eliminate the prosecution’s responsibility to disclose the evidence, because the Brady rule is framed in a manner that permits its application to evidence of which the prosecutor might be ignorant. Kyles v. Whitley, 514 U.S. 419, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995); Bagley and Agurs, supra; United States v. Brooks, 966 F.2d 1500 (D.C.Cir.1992). Therefore, under a Brady and Kyles analysis, the prosecution may be deemed to have suppressed evidence, even though no prosecutor actually knew of the existence of the evidence until after trial. In other words, as the Court stated in Kyles, “a prosecutor anxious about tacking too close to the wind will disclose a favorable piece of evidence.” Kyles, 514 U.S. at 419, 115 S.Ct. at 1568. See, John C. Lambrose, Discovery In the Wake of Kyles: Don’t Tack Too Close to the Wind, 3 Nev. Law. 10 (1995); Note, Prosecutors Must Disclose Exculpatory Information When The Net Effect of The Suppressed Evidence Makes It Reasonably Probable That Disclosure Would Have Produced A Different Result — Kyles v. Whitley, [514 U.S. 419] 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995), 26 Seton Hall L.Rev. 832. Do the facts of this case support a Brady challenge? Did the prosecutor tack too close to the wind? I do not make that final determination at this time, because all the facts surrounding the failure of the State to produce Dr. Maier’s notes are not in the record. Clearly, White’s testimony at the Rule 32 hearing is not in the record because he suc- *490 eessfully invoked his Fifth Amendment privilege.
Although it is admitted that the prosecution had no knowledge of Dr. Maier’s notes, it seems that the notes were to be included within those documents that Wilson specifically asked to be produced. I believe that the determinative issue is: On what date were Dr. Maier’s additional notes received by Taylor Hardin and made part of James White’s institutional file? Why were those notes not disclosed to Wilson prior to her trial, especially in view of the fact that the stipulation of facts entered into by the prosecution and the defendant at the Rule 32 hearing stated that Dr. Maier’s report was turned over “pursuant to an order [entered] by Judge Thomas Younger?” I believe that Wilson is entitled to answers to these questions.
The United States Supreme Court, in Agurs, stated that “when the prosecutor receives a specific and relevant request, the failure to make any response is seldom, if ever, excusable.” Agurs, 427 U.S. at 106, 96 S.Ct. at 2399. The rationale behind this rule rests on the principle that a specific request puts the prosecution on notice of what evidence the defendant desires, thus alleviating the prosecution’s burden of determining what might be, and what might not be, relevant to the defense. On the other hand, the failure of the prosecution to turn over specifically requested evidence, to which no objection is filed, could mislead the defendant into believing that the evidence does not exist. The United States Supreme Court stated in Bag-ley:
“We agree that the prosecutor’s failure to respond fully to a Brady request may impair the adversary process in this manner. And the more specifically the defense requests certain evidence, thus putting the prosecutor on notice of its value, the more reasonable it is for the defense to assume from the nondisclosure that the evidence does not exist, and to make pretrial and trial decisions on the basis of this assumption.”
473 U.S. at 682-83, 105 S.Ct. at 3384.
Wilson’s discovery request was styled “Motion for Discovery of Institutional Records and Files Necessary to a Fair Trial.” (Emphasis added.) Wilson’s motion seems to have been specifically directed, and the records sought seem to have been specifically identified.[11] Her motion was based not just on the provisions of Rule 16, Ala. R.Crim. P., but also on the disclosure requirements articulated in Brady v. Maryland. “This constitutional duty [to disclose exculpatory evidence], established by the [United States] Supreme Court’s interpretation of our Constitution, was affirmative, anterior to, and weightier than the district court’s [discovery] order and Rule 16 [of the Federal Rules of Criminal Procedure].” United States v. Wood, 57 F.3d 733, 737 (9th Cir.1995).
Under the facts of this case, where the defendant specifically sought to discover “Institutional Records and Files” of the State’s chief witness, the trial court, on remand, should review its finding that had the defendant made a specific request, it would have been granted. The duty to comply with a specific request seems even more compelling because Wilson was charged with capital murder, and she cited Ex parte Monk, 557 So.2d 832 (Ala.1989), in support of her discovery request. In Monk, this Court held that the very nature of a capital case requires that in such a case the prosecution be subject to broader discovery orders than it is subject to in other cases. “The hovering death penalty is the special circumstance justifying broader discovery in capital cases.” Ex parte Monk, 557 So.2d at 836-37.
Furthermore, in this case, the parties stipulated that Dr. Maier was required by the Department of Mental Health and Mental Retardation to transcribe his handwritten notes and to send them to Taylor Hardin to be made part of White’s mental competency evaluation. The fact that Dr. Maier was required by a State agency to perform this act strengthens the defendant’s argument *491 that the prosecution was under a duty to disclose them in this case.
The State expresses a fear that a reversal in this ease would put on the State a difficult burden to produce records held by State agents of which it had no knowledge, but I do not base my dissent on that theory. Here, there was a pre-trial request for specific records held by a State agency, and even though that agency probably was not an “agent of the prosecution” within the meaning of that phrase as used in the Brady line of cases, I believe that the law has been, and continues to be, that when a defendant files a motion to produce specific evidence in the custody of the State, and the prosecution does not object to its disclosure, then the prosecutor has an obligation to turn over for inspection or copying specifically requested evidence that has been ordered to be produced. Many records that are discoverable under the provisions of Rule 16 do not contain exculpatory evidence. In fact, many of them contain inculpatory evidence, but that does not affect the right of a defendant to have the evidence disclosed.
Brady applies to the disclosure of exculpatory evidence, and Brady limits the scope of the evidence a prosecutor is under a duty to disclose; consequently, I should not be understood as saying that I would require the disclosure of records that are not covered under the Brady guidelines, as further interpreted in Kyles. This case presents a different issue: What if the State fails to produce records in the possession of a State agency when those records are material and the defendant files a motion requesting their production?
I do not believe that the Alabama Department of Mental Health and Mental Retardation was an agent of the prosecution under the facts of this case; therefore, I do not address the issue as if it were just a Kyles issue. Here, there was a specific request, and I believe that under the law such material should have been disclosed, and in such instances the application of the “harmless error” rule is almost negated.
In reviewing whether the principles set out in Kyles, Bagley, or Agurs apply, each case must be reviewed based on its particular facts. In Kyles, Bagley, and Agurs the United States Supreme Court held that the pros-ecutorial authorities were considered to have had knowledge of facts that were known to law enforcement officers, who were considered to be agents of the prosecution in those cases. There could be other cases where the prosecution, as here, does not know of the exculpatory evidence until after the trial. A reviewing court must independently determine whether the prosecution should be held responsible for its failure to produce the exculpatory evidence, based on the facts of each case.
In this case, the trial judge, in his September 2, 1992, order, directed the prosecution to turn over documents that were “known to exist or which with due diligence could be determined to exist, and to allow the attorneys [for Wilson] to inspect, test, examine, photograph or copy the same.” (Emphasis added.) Apparently, the trial judge found, in denying Wilson’s Rule 32 petition, that Wilson’s attorneys “were on notice that Dr. Mai-er had interviewed White in compiling his evaluation and should have anticipated that he took notes during the interview,” thus suggesting that Wilson’s attorneys should have done more than they did by filing the discovery request and the motions to expedite. The trial judge did not articulate what he meant by stating in his September 2, 1992, order that the prosecution should exercise “due diligence,” and he did not explain why he thought Wilson’s attorneys had an obligation to do more than they did when they filed specific motions to produce that I believe included the notes. On remand, the trial judge would have an opportunity to address this issue also. In doing so, the trial judge might consider the holding in United States v. Brooks, 966 F.2d 1500 (D.C.Cir.1992), where the Court of Appeals for the District of Columbia Circuit held that the prosecution had violated the principles of Brady by failing to search for easily obtainable information. In support of this holding, the court stated:
“Of course the prosecutor’s own interest in avoiding surprise at trial gives him a very considerable interest to search accessible files for possibly exculpatory evi *492 dence, quite independent of Brady. Accordingly there is less need for a judicially constructed incentive than in the classic Brady situation, where prosecutors already possess the information but may have little incentive to divulge it apart from the Brady rule itself. We suspect the courts’willingness to insist on an affirmative duty of inquiry may stem primarily from a sense that an inaccurate conviction based on government failure to turn over an easily turned rock is essentially as offensive as one based on government nondisclosure. See, e.g., Calley v. Callaway, 519 F.2d 184, 223 (5th Cir.1975)....”
Brooks, 966 F.2d at 1502-03. (Emphasis added.)
The second element of a Brady analysis relates to whether the suppressed evidence was favorable to the defendant. The trial judge, in denying Wilson’s Rule 32 petition, said, in part:
“Based upon all the evidence and the stipulation entered by the parties, the Court finds that even had the apparent inconsistency been used in White’s examination, there is no significant chance that the jury would have reached a different result. There were some inconsistencies in White’s testimony at trial, but there were many other factors considered by the jury. The record is replete from credible witnesses linking the Petitioner to Mr. White and the crime. The fact that Dr. Maier’s ‘additional notes’ may have been useful to the defense is not the legal question. The Court specifically finds that this additional evidence would not have changed the outcome of the trial.”
On remand, the trial judge could reevaluate that finding in view of what I have said and in view of his consideration of any further evidence that might be presented on remand. To assist the trial court, I would note that there can be little question that Dr. Maier’s notes were favorable to the defense. White was the prosecution’s star witness; Wilson could not be convicted of capital murder without this witness’s testimony.[12] The statement by White to Dr. Maier that he committed the crime between 6:00 and 6:30 p.m. is favorable to the defense, because it is undisputed that both Wilson and the prosecution presented evidence of her whereabouts at this time, thus giving her an alibi. In addition, this evidence could have been used by Wilson to impeach White’s trial testimony.
The third determination that must be made in a Brady analysis is whether the suppressed evidence was “material” to the issues presented at trial. The United States Supreme Court, on at least two occasions, has addressed and modified the standard for determining whether certain evidence was material to the issues presented at trial.[13] In Bagley, the Court held that favorable evidence “is material” and constitutional error results from its suppression by the prosecution “if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.” 473 U.S. at 682, 105 S.Ct. at 3388. However, in the recent opinion in Kyles v. Whitley, that Court refined the definition of Brady materiality that it had given in Bagley, citing four aspects of materiality that bear emphasis under the standard articulated in Bagley.
First, “[although the constitutional duty is triggered by the potential impact of favorable but undisclosed evidence, a showing of materiality does not require demonstration by a preponderance of the evidence that disclosure of the suppressed evidence would have resulted ultimately in the defendant’s acquittal.” Kyles, 514 U.S. at -, 115 S.Ct. at 1565-66. In explaining this aspect of materiality, the Court explained:
“Bagley’s touchstone of materiality is a ‘reasonable probability’ of a different result, and the adjective is important. The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence [the defendant] received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A ‘reasonable probability’ of a different result is accordingly shown when the Gov *493 ernment’s evidentiary suppression ‘undermines confidence in the outcome of the trial.’ ”
Kyles, 514 U.S. at -, 115 S.Ct. at 1566. Second, Bagley materiality should not be considered a sufficiency-of-the-evidence test. “One does not show a Brady violation by demonstrating that some of the inculpatory evidence should have been excluded, but by showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.” 514 U.S. at -, 115 S.Ct. at 1566. Third, in terms of Bagley materiality there is no such thing as harmless error. “[OJnce a reviewing court applying Bagley has found constitutional error there is no need for further harmless error review.” 514 U.S. at -, 115 S.Ct. at 1566. In other words, once a Brady violation has occurred, a court should not consider whether the suppression was harmless error; the court should determine only whether the suppressed evidence was “material.” “The fourth and final aspect of Bagley materiality to be stressed here is its definition in terms of suppressed evidence considered collectively, not item-by-item.” 514 U.S. at -, 115 S.Ct. at 1567. In other words, a reviewing court must look at all the evidence that was suppressed, collectively, when determining whether the evidence was “material.” Id.
Based on the foregoing facts, I would not quash the writ relating to the judgment entered in the Rule 32 appeal, but would remand the cause to the Court of Criminal Appeals with directions to order the trial court to take whatever action is deemed necessary to answer questions similar to the ones that I pose in this opinion, and to reevaluate its prior decision in view of the legal principles that I have set out in this opinion.
It appears to me that Wilson is at least entitled to have the trial court conduct further hearings and make further inquiries to determine whether Wilson has met her burden of showing that she is entitled to a new trial because of the State’s failure to produce Dr. Maier’s notes.
On remand, the trial court could take into consideration all of the factors I mention, in deciding whether Dr. Maier’s notes are material evidence and whether, because of the failure to produce these notes, Brady requires that the defendant be given a new trial. In considering the ultimate issue, the trial court could consider whether Dr. Mai-er’s notes are to be considered impeachment evidence, rather than exculpatory evidence; it could have been used to impeach White on cross-examination and in argument to the jury. The fact that these notes are only impeachment evidence is irrelevant, because there is no difference between impeachment evidence and exculpatory evidence in terms of raising a valid Brady claim. See, Bagley, 473 U.S. at 676-77, 105 S.Ct. at 3380-81; Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972).
In applying Kyles to determine whether “there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different,”[14] a court must look to the aspects of materiality announced in Kyles, and determine whether the suppression of this evidence “undermines confidence in the outcome of the trial.” Here, the court should have considered the fact that the prosecution apparently thought that it was important to establish Wilson’s whereabouts on the day of the murder, and that the defense took the position that White’s testimony was specifically designed to comport with the prosecution’s theory of how the crime occurred.[15]
*494 I believe that the trial court should reevaluate its previous determination about the effect of the nondisclosure of Dr. Maier’s notes, and determine whether Dr. Maier’s notes “could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.” Kyles, 514 U.S. at -, 115 S.Ct. at 1566.
I now consider Wilson’s argument that White had recanted his trial testimony and that this recantation, coupled with other evidence, entitled her to a new trial. W ,on, in her motion filed pursuant to Rule 32.1(e), Ala. R.Crim. P., asked the court to grant a new trial based on “newly discovered evidence.” The newly discovered evidence that Wilson argued required a new trial was White’s recantation and the discovery of Dr. Maier’s supplemental notes that I have discussed above. Wilson argued that these items of evidence, taken cumulatively, required a new trial.
The trial judge, pursuant to Rules 32.8 and 32.9, Ala. R.Crim. P., held a pretrial conference, followed by an evidentiary hearing. At that hearing, Wilson introduced evidence that White had recanted his trial testimony: that evidence consisted of a copy of White’s recantation affidavit; the testimony of Mike McCulley, an inmate whose cell was near White’s; and the testimony of a prison official who witnessed White’s signature on the affidavit. She also submitted a copy of Dr. Maier’s supplemental report. McCulley testified that White told him on many occasions that he had falsely implicated Wilson and Lowe, and he testified that White would often stay up late into the night, praying aloud for forgiveness for testifying falsely. Charles Edward Bailey, an employee of the Alabama Department of Corrections, testified that James White signed the affidavit in Bailey’s presence while Bailey was working at the St. Clair Correctional Facility. The defense then called James White to the stand, but White refused to testify about his recantation, invoking his Fifth Amendment right against self-incrimination, which I do not believe that he could properly do.[16] Based on the foregoing, I believe that the Court of Criminal Appeals erred in affirming the trial court’s ruling that White could invoke his Fifth Amendment right against self-incrimination, and that is another reason the cause should be remanded.
The trial judge ruled that Wilson had not carried the requisite burden imposed on one seeking a new trial.[17] The Court of Criminal Appeals affirmed. I believe that court erred. I would remand the cause to the Court of Criminal Appeals with instructions to direct the trial court to reevaluate its prior judgment denying Wilson’s Rule 32 petition in light of what I have said in this opinion, and make return to this Court within a reasonable time after the certificate of judgment is entered; consequently, I respectfully dissent.
APPENDIX A
IN THE CIRCUIT COURT OF MADISON COUNTY, ALABAMA
STATE OF ALABAMA
vs.
BETTY GAY WOODS WILSON
Case No. CC-92-1194Y

ORDER

The defendant in this case is charged by indictment with a capital felony. The discovery provisions of Rule 16, Alabama Rules of Criminal Procedure, should be deemed to establish the minimum discovery afforded the defendant as a matter of right. It is therefore, ordered by the Court as follows:
*495 1. The Court directs that, subject to Paragraph 2, the District Attorney is to maintain an ongoing “open file” policy with regard to discovery by the defendant. Upon written request the State is to allow the defendant’s attorneys full and complete access to all documents, statements, writing, photographs, recordings, evidence, reports, and any other file materials in possession of the State, or any police agency involved in this ease, which is known to exist or which with due diligence could be determined to exist, and to allow the attorneys to inspect, test, examine, photograph or copy the same.
2. This Order should not be construed to require the State to disclose any notes, mem-oranda, writing or documents prepared by the District Attorney or his staff in trial preparation or to disclose or produce any confidential material, unless such would be required to be produced under Rule 16 or the same would be otherwise discoverable under Brady v. Maryland. Any such material withheld from the defendant by the State is to be presented for an in camera review at a hearing to be set for such purpose. Copies of any material not required to be furnished the defendant [are] to be placed in a sealed envelope in the custody of the Clerk for preservation for possible review at a later date by this Court or an appellate court.
3. This Order is intended to expedite the case preparation and trial process as well as to simplify the issues for possible appellate review. It should not be construed to bestow on the defendant any absolute right to discovery not granted by the Constitution of the United States, the Constitution of Alabama, the laws of the United States or of Alabama, or case decisions or rules promulgated by appropriate court.
4. The State or the defendant may seek relief from or modification of any aspect of this Order upon timely request, and this Order may be amended by the Court as time and circumstances dictate.
This the 2nd day of September, 1992.
/s/ Thomas N. Younger
THOMAS N. YOUNGER
Circuit Judge
APPENDIX B
IN THE CIRCUIT COURT OF TUSCALOOSA COUNTY, ALABAMA
SIXTH JUDICIAL CIRCUIT OF ALABAMA
STATE OF ALABAMA, Plaintiff,
vs.
BETTY WOODS WILSON, Defendant.
Case No.: CC-92-1893

MOTION TO EXPEDITE MOTIONS FILED

COMES NOW the Defendant, Betty Woods Wilson, by and through her attorney of record, and moves this Court to expedite its decisions on the following motions:
1. Motion for Recordation filed June 17, 1992;
2. Motion to Apply Heightened Standard or [sic] Review and Care In This Case Because the State is Seeking the Death Penalty filed July 17,1992;
3. Motion to Inspect, Examine and Test All Physical Evidence filed July 17,1992;
4. Motion to Reveal the Identity of Informants and Reveal any Deals, Promises or Inducements filed July 17,1992;
5. Motion for Immediate Inspection of Documents and Tangible Objects filed July 21,1992;
6. Petition for Psychiatric Examination of CoDefendant filed July 30,1992;
7. Motion to Suppress Evidence filed July 30, 1992;
8. Motion for Disclosure of Acts and Statements of CoConspirators filed July 30,1992;
9. Motion for Production of Statements of Individuals Not to Be Called As Witnesses filed July 30,1992;
10. Motion to Disclose Identity of Known and Unknown Unnamed Co-conspirators filed July 30,1992;
*496 11. Motion to Disclose Identity of Informant filed July 30,1992;
12. Motion to Compel Disclosure of Search Warrants, Affidavits and Returns of Searches Conducted filed July 30, 1992;
13. Motion for Discovery of Institutional Records and Files Necessary to A Fair Trial filed July 30,1992;
14. Ex Parte Motion to Order Sheriff to Allow Effective Right of Counsel [filed] July 30, 1992;
15. Motion for Notice By the Prosecution of the Intention to Use Evidence Arguably Subject to Suppression filed July 30, 1992;
16. Motion to Dismiss the Indictment on the Grounds that Its Two Counts are Duplicitous Or To Require The State to Elect A Single Offense filed July 30, 1992;
17. Motion for Production or Results of Polygraph Examination Conducted on Potential Prosecution Witnesses filed July 30,1992;
18. Motion to Compel State to Affirm or Deny Electronic Surveillance filed July 30,1992; and
19. Motion to Expedite Motions Filed and Request to Allow Defendant to Have a Dictaphone in Her Jail Cell filed August 8,1992;
As grounds the Defendant would state the following:
1. This matter has been set for trial in Tuscaloosa County, Alabama beginning on February 22,1993.
2. The above[-]refereneed motions should be heard and a decision rendered as soon as possible, so that the Defense have an opportunity [sic] to prepare their case for the upcoming trial.
WHEREFORE, PREMISES CONSIDERED, Defendant prays that this Court would hear the above[-]mentioned motions on an expedited basis, and render a decision as soon as practicable.
/s/ Marc Sandlin
Marc Sandlin
Attorney for Betty Woods Wilson 223 East Side Square Huntsville, Alabama 35801 (205) 534-6321

. Wilson made the following allegations in her Rule 32 petition:
"The defendant’s counsel learned for the first time in September 1993, that the State of Alabama had failed to turn over to defendant’s counsel a report from the psychologist employed by the State of Alabama to evaluate James White. The report of the psychologist would have been extremely useful in cross-examining James White during defendant's trial. The report, among other things, indicates that James White did not leave the Wilson residence until between 6:00 and 6:30 p.m. on May 22, 1992. That statement as to the time White left the Wilson residence was completely inconsistent with the other times established by the State to implicate the defendant. If White did indeed leave the Wilson home between 6:00 and 6:30 p.m., then his stoty that Betty Wilson picked him up at the Wilson home after the murder’would have been destroyed because from 5:25 p.m. until 9:00 p.m. Betty Wilson was in the company of many people at other locations in Huntsville. The psychologist's report was based on an interview with White in August 1992, long after White had gotten his story straight. The date of the interview greatly enhanced the importance and usefulness of the report. The evidence would have been extremely damaging to the testimony of James White and the failure of the State to turn over this report to the defendant results in a denial of due process to her.”

. Wilson filed a request, on application for rehearing in the Court of Criminal Appeals, pursuant to the provisions of Rule 39(k), Ala. R.App. P., that the Court of Criminal Appeals consider her statement of additional facts. Judge Patterson dissented from the court's denial of rehearing and listed additional reasons why he thought the court should review the additional facts stated in Wilson’s motion and why he thought the rehearing should be granted. 690 So.2d at 477.

. In her petition, Wilson claimed that this date was in September 1993. The record shows that Lowe's attorneys were given not only the evaluation of White, but also the supplemental notes; however, this occurred after Wilson had been tried.

. The record shows that Wilson requested that the trial court issue a subpoena duces tecum to each of approximately 16 private medical institutions and physicians, because White’s attorney had “made public statements relating to his client's history of substance abuse, his extended history of mental illness, and his client’s extended history of medical treatment.” In asking the trial court to issue these subpoenas, Wilson argued that "there is a reasonable likelihood that the [medical] records in question will disclose material information or evidence of substantial *483 value with respect to ... [White’s] competency to testify, history of delusions and/or fantasies.” Wilson’s motion appears to have made clear the type of information she wanted produced and why she wanted it produced.

. In his dissenting opinion, Judge Patterson stated: "1 am compelled to dissent because I do not believe that the prosecution’s evidence independent of White's testimony corroborated White’s testimony, and thus I believe that [the prosecution] did not meet the requirements of § 12-21-222 [Ala.Code 1975], It is my opinion that the trial court's ruling denying Wilson’s motion for judgment of acquittal constituted reversible error." 690 So.2d at 476.

. The record shows that initially the trial judge was of the opinion that White could not claim the privilege.

. The record shows that the following occurred at the Rule 32 hearing:
"THE COURT: All right. Mr. White, your motion to appoint counsel is denied. Stand and raise your right hand.
"(Whereupon the witness was sworn.)
"MR. WHITE: But the defendant also claims his Fifth Amendment rights.
“THE COURT: That's another matter to which — well, I don't believe that — I believe you will be required to testify, let me put it that way. And we will proceed with the questioning, and you may oppose — I mean, you may interpose your objection as we go along and the Court will rule on it specifically as we go along, but, generally speaking, you would not be entitled to assert Fifth Amendment rights.
"MR. WHITE: Well, not meaning no disrespect to the Court, Your Honor, but according to Rule 6 of the Alabama Code, that any criminal proceedings that may incriminate me to further prosecution, entitles me to an attorney in any type criminal proceeding.
"THE COURT: Mr. Drake, you may proceed. (Footnote continued on page 488.)
*488 "EVIDENCE ON BEHALF OF THE PETITIONER: JAMES DENNISON WHITE — being first duly sworn, was examined and testified as follows:
"DIRECT EXAMINATION BY MR. DRAKE:
"Q: Would you state your name, please?
"A: James D. White.
"Q: And are you the same James D. White who testified at the trial of Betty Wilson?
"A: I stand on my Fifth Amendment rights.
"Q: At the trial of Betty Wilson, you testified that Betty Wilson and her sister, Peggy Lowe, hired you to kill Dr. Jack Wilson. Was that testimony true or was it false?
"A: I stand on my Fifth Amendment rights. “MR. DRAKE: Judge, I don't think he has the right to invoke it.
"THE COURT: You have no right to invoke the Fifth Amendment in this matter and you are directed to testify.
“MR. FRY [prosecutor]: Your Honor, may we be heard on that?
"THE COURT: Right.
"MR. FRY: There is one matter, I guess, the State needs to bring to the Court's attention in considering the Fifth Amendment privilege.
"Mr. White may be being put in the predicament of now admitting perjury under oath, for which he could be prosecuted, or he may be being put in the posture of giving testimony which possibly could be different materially from that which he gave at trial. And, if so, could at least arguably reopen the prosecution of his case for capital murder.
"I would like to bring that to the Court's attention in the questions regarding his testimony as it relates to perjury during the trial or conduct as it relates to a possible further prosecution of his own case.
"THE COURT: Mr. Drake?
"MR. DRAKE: Judge, I addressed that in writing in my pretrial letter brief, and it seems to me the cases are clear that—
"THE COURT: I think the cases are clear, but as to the question of perjury, I don't know that that has been answered. He does open himself up to potentially committing perjury because he is now under oath. The statement that he gave—
“MR. DRAKE: Well, I think the State has waived its right to prosecute him for that in the plea agreement they entered into with him.
"MR. FRY: We are talking about now perjury at this time, not perjury in Tuscaloosa [the venue of Wilson's trial]. We are talking .about perjury now.
"MR. DRAKE: Well, I don't think a witness can invoke the Fifth Amendment because he wants to avoid lying. I mean, that — I don't understand how that any witness could do that. You know, you can’t make me tell the truth, is essentially what Mr. Fry is arguing you can’t do to Mr. White.
"MR. FRY: I'm arguing you can’t make him make a statement which incriminates him in regard to a matter before the Court.
"THE COURT: That would be the case, Mr. Drake, this Court would not be able to force him to make a statement that would be incriminating, and it might very well be that telling the truth would be incriminating.
"MR. DRAKE: Well, if that were the case, any witness could make that Fifth Amendment invocation, and I don't see — the whole process of the proceeding, and any judicial proceeding, is to get at the truth. If a witness says ‘I’m not going to let you get at the truth because it would incriminate me,’ that would destroy the whole judicial system.
"MR. FRY: That's kind of what the Fifth Amendment is about, unfortunately for us. "THE COURT: All right. I’m going to sustain it.”
(C.R.25-29J

. In support of its holding, the Court wrote., "society wins not only when the guilty are convicted but when criminal trials are fair; our system of the administration of justice suffers when any accused is treated unfairly.” Brady, 373 U.S. at 87, 83 S.Ct. at 1197.

. In Agurs the Court held that the standard for determining materiality is dependent on the type of Brady violation claimed by the defendant. The three different types of situations that the Court determined could arise in a Brady context were: 1) where previously undisclosed evidence revealed that the prosecution introduced testimony that it knew or should have known was perjured; 2) where the prosecution failed to accede to a defense request for some specific kind of exculpatory evidence; and 3) where the prosecu *489 tion failed to volunteer exculpatory evidence never requested, or requested only in a general manner. 473 U.S. at 103-06, 105 S.Ct. at 3069-71. The Court held that the failure to disclose evidence covered by the first two situations should be reviewed under a more lenient standard than the failure to volunteer exculpatory evidence that was not requested, because in the first two situations the prosecution is put on notice of the evidence, contrary to the situation where exculpatory evidence is not requested. Id. at 111-13, 105 S.Ct. at 3073-74. See, Terrence J. Galligan, Comment, The Prosecutor's Duty to Disclose Exculpatory Evidence after Bagley v. United States, 1 Geo. J. Legal Ethics 213 (1987); Paul G. Nofer, Note, Specific Requests and the Prosecutorial Duty to Disclose Evidence: The Impact of United States v. Bagley, 1986 Duke L.J. 892 (1986).

. The Court in Agurs held that "[i]f the suppression of evidence results in constitutional error, it is because of the character of the evidence, not the character of the prosecutor.” 427 U.S. at 110, 96 S.Ct. at 2401.

. Dr. Maier's notes were produced to attorneys who represented Peggy Lowe. I do not know the circumstances surrounding the production of the notes in that case, however. All that this record shows is that Lowe's attorneys disclosed them to Wilson's attorneys.

. See note 5.

. See note 9.

. Bagley, 473 U.S. at 682, 105 S.Ct. at 3383-84.

. White testified that he was so intoxicated on the afternoon of the murder that he could not remember what time it was when he killed Dr. Wilson or what time it was when Ms. Wilson allegedly picked him up. In fact, in all his statements to the authorities, including the seven statements given to the police and including his trial testimony. White never testified as to what time the murder occurred. In order to supplement White's testimony, the prosecution showed that Wilson’s whereabouts were unknown from 4:55 to 5:25 p.m. that afternoon. The prosecution contended that it was during this time that Wilson participated in the murder by picking up White and delivering him to his truck. The prosecution attempted to further prove this theory through a witness who claimed she saw Wilson driving two blocks from the Wilson home around 5 p.m. that day. The defense attempted to dis *494 prove this theory by circumstantial evidence indicating that the murder took place after 5:15 p.m., thus giving Wilson an alibi and bolstering Wilson's contention that White was falsely implicating her to avoid the possibility of receiving the death penalty.

. The prosecutor supported this action taken by White, and the trial judge ruled that White had the right to refuse to testify.

. Rule 32.3, Ala. R.Crim. P., states that a defendant petitioning for a new trial must prove "by a preponderance of the evidence the facts necessary to entitle the petitioner to [the requested] relief.”